## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER GREENBERG, DDS, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>PATTERSON COMPANIES, INC., HENRY SCHEIN, INC., and BENCO DENTAL SUPPLY CO.,<br><br>    Defendants. | Case No.:  16-cv-1280<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alexander Greenberg, DDS, ("Plaintiff") bring this antitrust action on behalf of himself and all others similarly situated who have purchased dental equipment and supplies (collectively, "Dental Supplies") directly from Patterson Companies, Inc., Henry Schein, Inc., and/or Benco Dental Supply Company (collectively, "Defendants"). Plaintiff alleges the following based upon personal knowledge as to matters relating to Plaintiff and upon information and belief as to all other matters:

### NATURE OF THE CASE

1.      Defendants, three oligopolistic distributors who dominate their industry and the market for the sale and distribution of Dental Supplies have conspired to maintain and extend their dominant collective market power in the market for distribution of Dental Supplies by acting in concert to unlawfully and artificially perpetuate entry costs of potential competitors and barriers to exit of current customers.  Their anticompetitive tactics include: (i) refusal to continue doing business with Dental Supply manufacturers that allow actual and potential rival distributors to distribute their products; (ii) refusal to continue sponsoring dental association annual trade shows

when the dental association endorsed or partnered with lower-cost distributors; and (iii) the spread of fear, uncertainty, and doubt about whether dentists who purchased Dental Supplies from a lower-cost distributor would receive the Dental Supplies purchased or necessary services and repairs relating thereto.

2.      Defendants' collusive and anticompetitive conduct constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Defendants' conduct has had the purpose and intended effect of allowing Defendants to maintain and enhance their collective market power, harm competition and consumers, and thereby to charge supracompetitive prices to Plaintiff and other members of the Class for Dental Supplies. Defendants took these actions to stifle innovation and competition from competing distributors who would lower prices of Dental Supplies for dentists, laboratories, and ultimately, patients. Defendants' misconduct foreclosed competition, maintained and extended their dominant collective market power in the market for distributing Dental Supplies.

3.      Under their conspiracy, Defendants exerted their substantial economic influence over manufacturers to coerce and pressure manufacturers to boycott both (a) competing distributors, and (b) potential business allies of competitors, such as state dental associations.

4.      This action seeks to recover from Defendants all improper overcharges paid above the competitive price that would have prevailed absent the conduct described above and to prevent Defendants from continuing this conduct, thereby allowing entry of effective competitors into the market for Dental Supplies, resulting in lower prices in the future.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26. Plaintiff seeks treble damages, and costs of suit, including reasonable attorneys' fees

from Defendants pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) for the injuries

Plaintiff and other Class members sustained due to Defendants' violations of Section 1 of the

Sherman Act, 15 U.S.C. § 1.

6.      Plaintiff also seeks injunctive relief pursuant to Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent Defendants from further violating the Sherman Act.  Plaintiff continues to

overpay for Dental Supplies due to Defendants' activities. Absent injunctive relief, the improper

agreements and industry structure alleged herein will continue to violate or threaten violations of

U.S. antitrust laws.

7.      This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331

and § 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) and

15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious

act, have an agent, and/or are found in this District, and (b) a substantial portion of the events

described below have been carried out in this District.

9.      This Court has personal jurisdiction over each Defendant because each Defendant

transacts business and is subject to personal jurisdiction within the Eastern District of New York.

Each Defendant sells Dental Supplies to dental practices and laboratories located in the Eastern

District of New York.

## PARTIES

### A. PLAINTIFF

10.     Plaintiff Alexander Greenberg, DDS, is a general practitioner dentist located in New York, New York. Plaintiff purchased Dental Supplies from Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Co. Inc. and was harmed by paying inflated prices for those products as a result of the misconduct alleged herein.

### B. DEFENDANTS

11.     Defendant Benco Dental Supply Co. ("Benco") is the third largest distributor of Dental Supplies in the United States. Benco is incorporated in Delaware and is headquartered in Pittston, Pennsylvania. During the relevant period, Benco sold Dental Supplies to dental practices and laboratories nationwide, including dental practices and laboratories in the Eastern District of New York.

12.     Defendant Patterson Companies, Inc. ("Patterson") is the second largest distributor of Dental Supplies in the United States. Patterson is incorporated in Minnesota and is headquartered in St. Paul, Minnesota. During the relevant period, Patterson sold Dental Supplies to dental practices and laboratories nationwide, including dental practices and laboratories in the Eastern District of New York.

13.     Defendant Henry Schein, Inc. ("Schein") is the largest distributor of Dental Supplies in the United States. Henry Schein is incorporated in Delaware and is headquartered in Melville, Long Island, New York. Henry Schein is the world's largest provider of health care products and services to office-based dental, animal health, and medical practitioners. It is a Fortune 500 Company and a member of the S&P 500 and NASDAQ 100 indexes. Henry Schein has more than 18,000 employees and services over a million customers.  It claims to have over

100,000 products in stock. Its 2014 sales were $10.4 billion. During the relevant period, Henry Schein sold Dental Supplies to dental practices and laboratories nationwide, including dental practices and laboratories in the Eastern District of New York.

## FACTUAL ALLEGATIONS

### A.    BACKGROUND, DENTAL SUPPLY INDUSTRY

14.    Dental Supplies are equipment and supplies that dental practices and dental laboratories purchase and use in their daily business. Examples of dental equipment include dental chairs, dental CAD/CAM systems, and imaging devices. Examples of Dental Supplies include acrylics, alloys and amalgam, anesthetics, burs, cements and liners, disposable paper and cotton suppliers, endodontic products, fluoride, hand pieces, impression materials, instruments, orthodontics, preventative products, retraction materials, surgical products, sterilization products, waxes, and x-ray films.  Dental practices and laboratories require a wide variety and consistent supply of such materials in their daily operations, all coming from some 300 manufacturers. The United States has over 135,000 dental practices and approximately 7,000 dental laboratories.

15.    A significant majority of Dental Supplies are sold by manufacturers to distributors such as Defendants. Distributors then serve as a "one-stop-shop" for Dental Supply customers, offering centralized warehousing, delivery, and billing services that enable customers to avoid carrying large inventories, dealing with numerous vendors, and negotiating numerous transactions. Because customers can achieve the economic benefit of minimizing administrative overhead by purchasing Dental Supplies from a single distributor, distributors selling only a partial line of Dental Supplies will not be able to compete effectively with full-line firms. Full line distributors are thus able to and do charge customers appreciable amounts for this service.  These premiums traditionally charged by Defendants for their services has left economic space for additional

distributors to enter the market and share in the profitability of the industry while paying manufacturers more for their Dental Supplies and charge customers less.

16.     For an entity to enter the distributor market and successfully sell Dental Supplies to dental practices and laboratories in the U.S., several key elements are required. The distributor must be able to offer a wide range of products from the more than 300 Dental Supplies manufacturers that make such products. The distributor must be able to purchase Dental Supplies in large enough volumes and at low enough prices to compete with competitor distributors. Finally, the entity must be able to market itself and offer Dental Supplies to large numbers of dental practices. To achieve success and be able to buy and stock the large quantity of supplies necessary to achieve economies of scale that allow for lower prices, new distributors must be able to reach large numbers of dental practices, laboratories, and Dental Supplies manufacturers efficiently.

17.     However, because of Defendants' anticompetitive conduct as described herein, the market for the distribution of Dental Supplies remains highly concentrated, with significant barriers to entry caused by Defendants' anticompetitive conduct. Together, Defendants make up over 80 percent of all sales in the market for distribution of Dental Supplies in the United States.

18.     State dental associations, which are voluntary associations of dentists, possess an important ability to connect a new distributor with Dental Practitioners statewide by endorsing and/or partnering with the distributor. State dental associations are not in the business of purchasing and selling Dental Supplies, but they can facilitate the entry of new distributors by partnering with new distributors and endorsing the distribution platform for their members.

19.     Defendants have thwarted the ability of dental associations to support new entrants by acting in concert to refuse to continue sponsoring trade shows when the association endorses or partners with lower-cost distributors.

20.     Moreover, Defendants have also exercised their combined market power in the market for distribution of Dental Supplies in the United States by acting in concert in refusing to continue doing business with Dental Supplies manufacturers that allow actual and potential rival distributors to distribute their products.

21.     Lower-cost distributors have for years attempted to enter the market, and many state dental associations have been actively interested in sponsoring and partnering with new distribution platforms as a benefit to their members. However, new distributors largely have been unsuccessful in partnering with or securing the endorsement of state dental associations because of Defendants' unlawful coordinated boycotts alleged herein. Defendants have frustrated other entities' attempts to do business with actual and potential rival distributors. Any successful entry of a new competitor into the Dental Supplies distribution market, and the resulting price discounts that would result from increased competition, would substantially threaten Defendants' collective market share, revenues and profits. As further detailed below, Defendants responded to the threat of competitive new rival distributors by conspiring to boycott and threaten entities in order to prevent the successful entry of new competitors into the Dental Supplies distribution market.

22.     As a result, despite the substantial profits enjoyed by Defendants, the market for the distribution of Dental Supplies in the United States remains highly concentrated. At all relevant times, Defendants have collectively possessed over 80% of all sales in the market for distribution of Dental Supplies in the United States as a direct consequence of their predatory market behaviors.

23.     Defendants' dominant collective market power has allowed them to foreclose the market to rival competition, thereby impairing competition, maintaining and enhancing market power, and charging inflated prices above competitive levels to Plaintiff and the Class.

**B.     DEFENDANTS' DOMINANCE OF THE RELEVANT MARKET**

24.    Defendants' anticompetitive conduct constitutes a horizontal group boycott that is a per se violation of Section 1 of the Sherman Antitrust Act. Therefore, Plaintiff does not need to define a relevant market.

25.    Alternatively, if the Court determines that Plaintiff's Sherman Act claim cannot proceed under a theory of per se group boycott, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the rule of reason. In this case, the relevant geographical market is the United States. The relevant product market is the market for the sale and supply of Dental Supplies to Dental Practitioners and laboratories.

26.    While hundreds of producers of Dental Supplies operate, the reality of the dentistry practice is that most of the over 100,000 dental practices in the country are small practices lacking the means to purchase their supplies directly from the hundreds of different manufacturers. Instead, dental practices and other direct purchasers use distributors like the Defendants who can fulfill most or all of their needs for Dental Supplies.

27.    For direct purchasers, there are no reasonably available substitutes for distributors of a wide range of Dental Supplies. Even if individual manufactures sell supplies directly, they do not carry a wide range of supplies and it is not economically efficient for dental practices and laboratories to maintain relationships with hundreds of different vendors. There are accordingly no reasonably available substitutes for distributors of a wide range, or full line, of Dental Supplies.

28.    At all relevant times Defendants possessed market power—the ability to profitably raise prices significantly above competitive levels while not losing sales—as evidenced by Defendants' abnormally high profit margins in what should be, if it were competitive, a tight, low profit margin, distribution market.

29.     Products sold by suppliers who do not offer a wide range of Dental Supplies for dental practices do not meaningfully temper Defendants' market or pricing power. The burden, expense and inefficiency associated with trying to purchase products from scores of suppliers is too great to provide a viable alternative to purchasing through distributors like Defendants. Furthermore, such producers themselves lack the ability to effectively distribute their products to thousands of dentists scattered across the country.

30.     Defendants sell Dental Supplies at prices well in excess of marginal costs and competitive prices and therefore have enjoyed artificially high profit margins, especially when compared with distributors of other types of medical products, like prescription pharmaceuticals.

31.     Defendants abuse their dominant collective market power by privately communicating and reaching agreements to engage in an anticompetitive scheme to foreclose and impair competition, maintain and enhance market power, and artificially inflate prices of Dental Supplies above competitive levels.

**C.     PERSISTENT COMPETITIVE VIOLATIONS BY DEFENDANTS**

32.     Defendants have abused their collective market power by privately communicating and agreeing to act in concert to engage in an anticompetitive scheme to foreclose and impede competition, maintain and enhance their market power, and artificially raise prices of Dental Supplies above competitive levels.

33.     Two examples of Defendants' anticompetitive conduct involve Defendants' group boycotts of SourceOne and Archer and White Sales. These examples show Defendants' continuing Sherman Act violations, and highlight their anticompetitive methods. Based on these examples and the industry market structure, including Defendants' close relationships, Plaintiff has good reason to believe that discovery will reveal further examples of Defendants' continuing violations.

34.     Defendants conspired to collectively pressure and threaten manufacturers and other distributors to discontinue and refrain from supplying new lower-priced distributors with Dental Supplies. In furtherance of this conspiracy, Defendants threatened that if manufacturers did business with new lower-priced distributors, Defendants would not sell or would not actively promote the manufacturers' products.

35.     Because Defendants collectively hold a dominant share of the Dental Supplies distribution market, and because many manufacturers are beholden to Defendants, these threats were successful in coercing many manufacturers to cease doing business with new or price-cutting distributors. These manufacturers substantially rely on Defendants to market and resell their products to dental practices and laboratories. If Defendants were to reduce their sales efforts or stop selling products from such a manufacturer, that manufacturer would suffer significant financial losses.

36.     If manufacturers did business with the new distributors, Defendants agreed to discontinue actively promoting, selling, and/or supporting the manufacturers' Dental Supplies.

37.     Rather than letting their respective resulting market shares be determined by competition, Defendants took the initiative to thwart all future competition and agreed to act together to protect their respective market shares through unlawful threats and boycotts of anyone who could help the new competitors to break into their market.

**1.     Pressure and Boycott of Manufacturers**

38.     As one example of Defendant's anti-competitive conduct, in 2013 a new distributor—SourceOne—created a Dental Supplies distribution platform in partnership with the Texas Dental Association ("TDA"), and planned to offer many of the same products offered by

Defendants at lower prices. The online sales platform, called "TDA Perks Supplies," allowed members of the TDA to purchase Dental Supplies from many different manufacturers.

39.     SourceOne reached an agreement with several manufacturers to offer Dental Supplies to TDA members at prices that were substantially less than Defendants' prices for similar products. TDA's endorsement allowed the new distributor to secure contracts with a significant number of Dental Supplies manufacturers, which in turn enabled it to offer dental practices the "one-stop shopping" convenience that was previously only offered by distributors such as Defendants.

40.     SourceOne posed a particularly strong competitive threat to Defendants' market control because of its approach to customers through an online marketplace linked to state dental associations.

41.     SourceOne's business model also involved use of buyer groups through the state dental associations. A group purchasing organization ("GPO") is an entity that helps healthcare providers — such as hospitals, nursing homes, and home health agencies — realize savings and efficiencies by aggregating purchasing volume, potentially using that leverage to negotiate discounts with manufacturers, distributors, and other vendors.

42.     Defendants agreed to act in concert to collectively pressure and threaten manufacturers to refrain from supplying new lower-priced distributors, like SourceOne, with Dental Supplies. More specifically, if manufacturers did business with the new distributors, Defendants agreed to discontinue actively promoting, selling, and/or supporting the manufacturers' Dental Supplies.

43.     As the first part of their collusive response to SourceOne's launch of its GPO platform including TDA Perks Supplies, Defendants collectively agreed to and did contact other

distributors and manufacturers to pressure those entities to stop supplying Dental Supplies to SourceOne and its GPO platform, including TDA Perks Supplies, and threatened to reduce or entirely stop their purchases from those manufacturers unless they complied.

44.     The Dental Supplies manufacturers' decisions, often simultaneous, to discontinue dealing with SourceOne was unprecedented and inexplicable in the absence of collusion among Defendants to impose coordinated pressure on multiple manufacturers simultaneously to pull their products from SourceOne and its GPO platform. The manufacturers had enjoyed increasing sales and revenues through SourceOne's platform.

45.     SourceOne reports that within a few months of unveiling its TDA Perks Supplies program, it had lost access to over three quarters of its top selling products, and reports that certain manufacturers specifically reported that their actions were in response to threats from Defendants.

46.     Dental Supplies manufacturers that Defendants coerced into boycotting SourceOne also manufacture equipment. Defendants' boycott had the purpose and effect of deterring manufacturers from selling equipment, as well as supplies, through SourceOne or its GPO platforms.

**2.      Pressure and Boycott of Dental Associations**

47.     SourceOne claims it further intended to compete by partnering with state dental associations to offer dentists a GPO purchasing system. SourceOne could lower its costs, lower its prices, and gain substantial market share from Defendants. Using its e-commerce platform, SourceOne sought to build, manage and service online sales platforms for state dental association.

48.     In addition to pressuring manufacturers, Defendants also conspired and agreed to boycott dental association annual trade shows and meetings that endorsed or promoted SourceOne—or considered endorsing or promoting SourceOne or other new full service, lower-

cost distributors. Dental associations depend on the attendance of major Dental Supplies distributors and their associated manufacturers at these events because revenues from these events account for a major portion of annual income for these associations.  To deter state dental associations from dealing with SourceOne, and thereby to forestall the substantial competitive threat that SourceOne's GPO platform posed to their revenues and profits, Defendants agreed with one another to break with their traditional practice of attending the trade shows of state dental associations and to boycott the trade shows and annual meetings of state dental associations that did or considered business with SourceOne.

49.     In furtherance of the conspiracy, Defendants threatened to boycott the annual meetings and trade shows of the TDA, Arizona Dental Association ("AZDA"), and the Louisiana Dental Association ("LDA") and did in fact boycott the TDA and AZDA.

50.     Defendants' conspiracy was successful in deterring state dental associations from proceeding with their planned partnership with SourceOne. Defendants' boycott of the state association trade shows threatened to impose substantial financial losses on state associations adopting SourceOne's GPO platform, because revenues from those trade shows are substantial components of a state association's budget, and Defendants' participation is essential to a successful trade show. Confronted with the choice of partnering with SourceOne weakened by Defendants' boycott of manufacturers dealing with SourceOne, and enduring the consequences of Defendants' boycotts of their own trade shows, or alternatively, assenting to Defendants' demands to refrain from doing business with SourceOne, the state dental associations almost uniformly chose to refrain from doing business with SourceOne. As a result, SourceOne's GPO platform has been adopted by only three state dental associations, rather than the scores of state

dental associations that would likely have adopted the platform but for Defendants' illegal and intimidation tactics.

51.     In March 2014, Patterson representatives met privately with TDA representatives and demanded that TDA end its contractual relationship with SourceOne and TDA Perks Supplies, or Patterson would no longer attend TDA's annual trade show or advertise in TDA's publications. A month later, in April 2014, Henry Schein representatives met privately with TDA representatives and delivered the same demands and threats.

52.     When TDA did not assent to Defendants' demands, the Defendants boycotted the TDA's annual meeting and trade show, held between April 30 and May 3, 2014. Defendants' decision not to attend TDA's annual meeting and trade show was unprecedented.

53.     Dozens of Dental Supplies and equipment manufacturers also stayed away from the TDA annual meeting and trade show, pulling out without warning – like Defendants – at the last minute, and at material commercial risk and cost.  Many of these manufacturers explained to the TDA that their decision to pull out of the annual meeting and trade show was a result of pressure applied by Patterson and Henry Schein to boycott the TDA for its support of SourceOne's GPO platform.

54.     As a result of the Defendants' boycott, and the concerted pressure Defendants brought to bear on Dental Supplies and equipment manufacturers to similarly boycott the TDA's 2014 annual meeting and trade show, that meeting and trade show had significantly fewer exhibitors, and was significantly less profitable for the TDA than previous shows. The Defendants' boycott of the TDA was specifically intended to send a message to TDA and to other state dental associations, many of which were actively interested in doing business with SourceOne, to refrain from doing so or suffer harms similar to those the Defendants inflicted on the TDA.

55.     AZDA went forward in a business relationship with SourceOne. After AZDA agreed to endorse SourceOne's GPO platform for the benefit of Arizona dentists, the Defendants retaliated against the AZDA by boycotting its annual meeting and trade show in March 2015. AZDA agreed to distance its name and associated good will from the marketing of SourceOne's GPO platform, diluting the benefit of AZDA's endorsement of SourceOne's GPO platform, making the platform less attractive to AZDA's members and a less effective competitor to Defendants.  Defendants nevertheless boycotted AZDA's trade show. Defendants were the only distributors that did not attend this meeting. Since chastened by Defendants' boycott, AZDA has not actively promoted SourceOne's GPO platform to its members.

56.     Defendants' threats to boycott state associations dealing with SourceOne deterred dozens of other associations from endorsing SourceOne's GPO platform, including the California Dental Association and the Colorado Dental Association.

57.     For example, after enthusiastically reacting to possibly endorsing SourceOne's GPO platform, the Colorado Dental Association advised SourceOne in January 2015 that it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA [Colorado Dental Association] and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it consummated its endorsement of SourceOne's platform. Like dozens of other state dental associations, the Colorado Dental Association abandoned plans to deal with SourceOne due to Defendants' anticompetitive conduct.

58.     Defendants' desire to avoid legitimate price competition from low-cost competitors did not start with its conduct aimed at SourceOne.

59.     Defendants have engaged in other collective anticompetitive conduct against distributors of Dental Supplies for many years, as shown by the example of their illegal group boycotts against Archer and White Sales, Inc. ("Archer"), a lower-priced distributor of Dental Supplies.

60.     Archer filed an antitrust case in the United States District Court for the Eastern District of Texas in 2012 and alleged that certain of the Defendants here engaged in the following similar anticompetitive conduct, among other things:

•       Conspiring to thwart Archer's growth in certain parts of the country;

•       Engaging in a price-fixing conspiracy by agreeing not to competitively bid against horizontal competitors;

•       Obstructing Archer's membership in the American Dental Cooperative, an organization created to help smaller companies compete against large national Dental Supplies distributors; and

•       Coordinating boycotts against Archer by threatening to stop buying equipment from certain suppliers and to stop selling equipment from certain manufacturers.

### 3.     Intimidation and Economic Uncertainty

61.     Defendants discouraged dentists from using other new full service, lower-cost distributors by spreading fear, uncertainty and doubt about the nature and quality of the Dental Supplies they sold. For example, Defendants conspired and agreed to represent, without regard to the truth or falsity of the representation, that these new distributors sold Dental Supplies that were altered, counterfeit, expired, sold through unauthorized distribution channels, or otherwise unfit

for their intended purpose. As a result, many dentists curtailed, or discontinued entirely, their purchases from these new distributors.

62.     Defendants also discouraged dentists from using other new full service, lower-cost distributors by threatening to withhold service and repair for installed equipment at their dental practices, or to do so after significant delay or at higher prices. Threatened dentists responded by curtailing or eliminating their purchases of Dental Supplies from the new distributors because these threats imperiled the viability of their dental practices, including the quality and efficacy of the care that these dentists could provide to their patients

## D.     THE RELEVANT MARKET IS RIPE FOR COLLUSION

63.     Together, Defendants comprise well over 80 percent of the Dental Supplies distribution market; they are an oligopoly whose interminglings result in monopolistic behavior – they have the ability to dictate supply and prices to the detriment of producers and consumers.

64.     On the Herfindahl-Hirschman Index ("HHI") which has a maximum score of 10,000.  The Department of Justice considers an HHI in excess of 2,500 to indicate a highly concentrated industry.  The HHI of the relevant market here is over 3,000.

65.     It is in the best interest of Defendants to maintain this market structure and avoid price competition; to do so they must deter all prospective entrants. Their particularly aggressive tactics provide a signal to those considering participating in the sale and distribution of Dental Supplies to stay away.

66.     Here, Defendants have acted in concert to increase the already high barriers to entry for distribution of Dental Supplies by exercising their collective influence over the key gatekeepers to entry into this market: dental associations and Dental Supplies manufacturers. This conduct has

increased the ability of Defendants to implement a successful group boycott of the type alleged here to artificially maintain their ability to charge customers supra-competitive prices.

67.     High barriers to entry in the market for distribution of Dental Supplies exist because new competitors must be able to achieve extraordinary economies of scale not only to provide competitive prices, but to also provide prices at rates so significantly reduced that that Dental Practitioners, laboratories, and dental associations would find doing business with new suppliers worth antagonizing Defendants.

68.     Lower-cost distributors have attempted to enter the Dental Supplies market. However, new distributors have largely been unsuccessful because of Defendants' unlawful coordinated boycotts alleged herein. Defendants' anticompetitive actions have taken advantage of their concentrated bargaining power and a prospective distributor's need for a wide range of suppliers to foreclose competitors from obtaining broad product lines they need to compete successfully with Defendants.

69.     Customers tend to be small and highly fragmented. Over 135,000 dental and orthodontic practices ("Dental Practitioners") and approximately 7,000 laboratories buy Dental Supplies, mostly from Defendants. The disparity in concentration between three Defendants and over 140,000 customers gives Defendants great bargaining power.  No single customer or group of customers is able to influence the price for supplies or tactics of Defendants.

70.     Acting as middle men in tandem, Defendants wield tremendous power over manufacturers and their decisions as to whom to sell their supplies and customers and on their decision as from whom to buy Dental Supplies and at what prices.

18

71.     Defendants, the dominant industry players, communicated with each other regularly, giving them opportunities to collude and encouraging a comfortable atmosphere for collusion.

72.     For example, the Texas Attorney General recently stated:

> The traditional dental supply distributors enjoy close relationships with one another, both personally and professionally. Many sales representatives, and even higher level employees, have previous employment relationships with other distributors. The employees interact regularly in person, at various social gatherings, and industry or trade association meetings, and remotely, through company email, personal email, personal cell phone calls, company cell phone calls, and text messaging. These close contacts provide the opportunity for the sharing of competitively- sensitive information among the various distributors and manufacturers.

## E.     GOVERNMENT INVESTIGATIONS

73.     Governmental entities at both the state and federal level are investigating Defendants for their anticompetitive conduct.

74.     The Texas Attorney General began investigating Defendants for anticompetitive conduct in violation of Texas antitrust statutes in 2014. The investigation resulted in the Texas Attorney General simultaneously filing a Petition and Final Judgment as to its claims against Defendant Benco on April 9, 2015, in which Defendant Benco, among other things: (a) agreed to pay money to the Texas Attorney General for fees and costs associated with the investigation; (b) stipulated to a permanent injunction that prohibits it from acting in concert with other manufacturers and distributors to limit Dental Supplies supply to distributors and other third parties; and (c) agreed to provide full, complete and prompt cooperation to the Texas Attorney General in relation to its continued investigation and related proceedings against other entities.

75.     The allegations in the Texas Attorney General complaint describe some of the same anticompetitive conduct alleged here. The allegations discuss Benco's role in boycotting

SourceOne, its business ally, the Texas Dental Association (TDA), and their business platform for TDA members, TDA Perks Supplies, including that:

- Consumable Dental Supplies are traditionally sold through a sales model by which a distributor's sales representative interacts directly with a purchasing dentist. As a part of this business, many dental supply distributors and manufacturers participate in trade shows sponsored by organizations, such as the annual meeting sponsored by the Texas Dental Association (TDA).

- The traditional dental supply distributors enjoy close relationships with one another, both personally and professionally. Many sales representatives, and even higher level employees, have previous employment relationships with other distributors. The employees interact regularly in person, at various social gatherings, and industry or trade association meetings, and remotely, through company email, personal email, personal cell phone calls, company cell phone calls, and text messaging. These close contacts provide the opportunity for the sharing of competitively-sensitive information among the various distributors and manufacturers.

- Benco and its competitor distributors understood that TDA Perks Supplies, with its potentially disruptive new business model, directly competed with them, and perceived a competitive threat based on the lower prices offered by TDA Perks Supplies for many of the same goods offered by Benco and its competitor distributors.

- Building on their historic culture of cooperation and communication, Benco and its competitor distributors engaged in ongoing communications over several months about TDA Perks Supplies. They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response.

- Benco and its competitor distributors (1) agreed to break with their traditional pattern and boycott the annual TDA meeting held in May 2014 because they perceived that TDA had positioned itself as a competitor to the traditional distributors, and (2) agreed to pressure other distributors and manufacturers to discontinue supplying TDA Perks Supplies and/or end any relationships with manufacturers or distributors that ultimately supplied TDA in order to stifle the competition provided by the new TDA offering.

- Benco and its competitor distributors did not attend the annual TDA meeting, despite the economic gains Benco and other distributors historically derived from the event.

20

- Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied TDA Perks Supplies.

- As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing TDA Perks Supplies to lose access to products.

76.     The Arizona Attorney General also initiated an investigation against Benco and other presently unknown Dental Supplies distributors for anticompetitive conduct in violation of Arizona law in 2014. The investigation resulted in the Arizona Attorney General issuing Civil Investigative Demands in October 2014. This investigation is ongoing and Benco has produced responsive documents and electronically stored information relating to the investigation.

77.     After the Texas and Arizona Attorneys General launched investigations, the Federal Trade Commission opened an investigation of Benco and other unnamed Dental Supplies distributors.  That investigation is ongoing.

## CIVIL LITIGATION

78.     A private antitrust action by Archer against certain Defendants was filed in the U.S. District Court for the Eastern District of Texas in August of 2012. See generally Complaint, *Archer and White Sales, Inc. v. Henry Schein, Inc.*, No. 2:12-cv-00572 (E.D. Tex.) The Archer complaint alleges an illegal group boycott to support a price-fixing scheme. That case is proceeding in arbitration.

79.     SourceOne has filed a separate individual private civil action against Defendants in the Eastern District of New York. See generally Complaint, *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, *et al.*, No. 2:15-cv-5440 (E.D.N.Y. Sept. 21, 2015). SourceOne's complaint alleges illegal group boycotts based on allegations similar to those of the present Complaint.

## DEFENDANTS' CUSTOMERS WERE INJURED BY DEFENDANTS' COLLUSIVE AND ANTICOMPETITIVE ACTIVITIES

80.     As alleged in this Complaint, Defendants have engaged in a continuing conspiracy in restraint of trade in violation of the Sherman Act.

81.     At all relevant times, Defendants sold substantial quantities of Dental Supplies in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants purchased and processed their Dental Supplies.

82.     Defendants maintained prices at exorbitant levels by acting in concert to maintain and increase their collective market power through their anticompetitive conduct.

83.     The anticompetitive conduct described in this Complaint maintained and increased Defendants' collective market power, enabling Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class. This harm to the Plaintiff and other Class members, in the form of paying artificially inflated prices for Dental Supplies, constitutes cognizable antitrust injury and harm to competition under the antitrust laws. To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms as well. As a result of the successful boycotts of new entrants, other potential competitors were discouraged from partnering with manufacturers and/or state dental associations to compete with Defendants.

84.     Competitors seeking to expand their geographic reach have been thwarted in their efforts to partner with Dental Supplies manufacturers and dental associations in order to compete with Defendants as a result of the group boycotts that Defendants successfully, but unlawfully, orchestrated.

85.     Besides the artificially inflated prices charged to Plaintiff and other Class members, the anticompetitive effects of the conspiracy alleged herein include, among other things: reduced

competition in the Dental Supplies distribution market, reduced United States business opportunities, reduced consumer choice, and harm to consumer welfare generally.

86.    Defendants' coordinated conduct in orchestrating group boycotts of distributors who attempted to expand their geographic reach foreclosed the entry of new national full-service distributors of Dental Supplies, thus thwarting new efforts to compete, maintaining Defendants' combined market power, and enabling Defendants to overcharge Plaintiff and other customers for Dental Supplies.

87.    If new low-cost distributors had not been unlawfully prevented from partnering with state dental associations and Dental Supplies manufacturers, they would have emerged as major competitors to Defendants, resulting in greater competition and substantially lower prices for Dental Supplies, and Plaintiff and the members of the Class would have paid substantially less for Dental Supplies during and throughout the Class Period. Defendants have maintained and extended their dominant market position because their anticompetitive agreements and abuse of economic power foreclosed competitors' access to suppliers, dental associations that could be strategic partners, and customers in the Dental Supplies market.

88.    If Defendants had not unlawfully conspired to prevent new low-cost distributors from partnering with state dental associations and Dental Supplies manufacturers, other competitors would have partnered with state dental associations and manufacturers and emerged as viable nationwide competitors to Defendants, resulting in increased competition and substantially lower prices for Dental Supplies, and Plaintiff and the members of the Class would have paid substantially less for Dental Supplies as a result during and throughout the Class Period.

89.    Because Defendants were successful in unlawfully preventing new low-cost distributors and other competitors from partnering with state dental associations and Dental

Supplies manufacturers to compete with Defendants, competition in the market was substantially harmed. As a direct result of Defendants' anticompetitive agreement, prices have been inflated and maintained at supracompetitive levels. Plaintiff and members of the Class have directly and proximately sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants.   The full amount of such damages will be calculated after discovery and upon proof at trial.

90.      Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct. Defendants' group boycotts foreclosed new entrant competitors, thereby suppressing competition, enhancing market power, and allowing Defendants to charge artificially inflated prices to dental practices and laboratories for Dental Supplies. Although the mechanism of antitrust injury to Plaintiff and to competitors is the same, the damages caused to Plaintiff and other members of the Class in the form of artificially inflated higher prices is distinct from, and not duplicative of, the damages caused to competitors in the form of lost profits and business opportunities.

91.      Defendants' anticompetitive conduct and resulting overcharges continue, causing continued injury to Plaintiff and the Class as a result of this misconduct. Defendants' anticompetitive conduct complained of in this Complaint will continue absent an injunction. Plaintiff and members of the Class are likely to continue to buy Dental Supplies in the future and will be repeatedly injured unless the continuation of this anticompetitive conduct is enjoined.

92.      The full amount of this antitrust injury that Plaintiff and other direct purchasers from Defendants have incurred will be calculated after discovery and upon proof at trial.

## CONCEALMENT AND TOLLING

93.     Defendants engaged in successful conspiratorial conduct; by its very nature, the success of a conspiracy depended on the co-conspirators concealment of its existence. On April 9, 2015, the Texas Attorney General filed a complaint against Benco, revealing some of the Defendants' anticompetitive conduct, and on September 21, 2015, SourceOne filed its private action revealing additional misconduct. But even those filings have given Plaintiff little information about some of Defendants' anticompetitive activities that remain undiscovered and are not pled in this Complaint.

94.     Plaintiff and the Class members could not have discovered Defendants' collusive conduct at an earlier date by the exercise of reasonable diligence. This is because of the  inherently self-concealing nature of a conspiracy as well as the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of,  and fraudulently conceal, their conspiratorial conduct.

95.     The Defendants' agreements alleged in this Complaint were wrongfully concealed and carried out in a manner that precluded detection. For example, the Texas Attorney General stated that Defendants' employees "interact regularly in person, at various social gatherings, and industry or trade association meetings, and remotely, through company email, personal email, personal cell phone calls, company cell phone calls, and text messaging. These close contacts provide the opportunity for the sharing of competitively-sensitive information among the various distributors and manufacturers."

96.     As noted in the Archer lawsuit, Defendants allegedly falsely represented to the new, low-cost distributor of Dental Supplies that the reason a manufacturer discontinued the distributor's right to sell its products was unilateral and based on legitimate business reasons and

falsely represented to Defendants' customers that the prices they paid for Dental Supplies were fair and reasonable.

97.     By virtue of such conduct by Defendants and their co-conspirators, and for other reasons, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the other Class members have as a result of the unlawful conspiracy violations and conspiratorial conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action on behalf of himself and all others similarly situated, as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

99.     The Class is defined as:

> All persons in the United States that directly purchased Dental Supplies and/or dental equipment from Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company at any time during the period from January 20,, 2012 until the conduct challenged in this Complaint ceases ("Class Period"). Defendants Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company and their subsidiaries are not included in the Class. Also excluded from the Class are federal and state entities that directly purchased Dental Supplies and/or dental equipment from one or more of the Defendants.

100.     Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  Members of the Class are so numerous that joinder is impracticable.  Over 135,000 Dental Practitioners and approximately 7,000 laboratories buy Dental Supplies, mostly from Defendants.

101.     The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable

from information and records in Defendants' possession, custody, or control.  The class includes tens of thousands of private dental practices and dental laboratories.

102.    The claims of the Plaintiff are typical of the claims of the Class in that the Plaintiff, like all Class members, purchased Dental Supplies and/or equipment during the Class Period from Defendants.  The representative Plaintiff, like all Class members, has been damaged by Defendants' misconduct in that they have incurred or will incur the damages associated with the anticompetitive practices.  Furthermore, the factual bases of Defendants' misconduct are common to all Class members and represent a common thread of misconduct resulting in injury to all Class members.

103.    Plaintiff will fairly and adequately represent and protect the interests of the Class because Plaintiff's interests coincide with, and are not antagonistic to, the interests of the Class. In addition, Plaintiff has retained counsel who are experienced and competent in prosecuting complex class action and antitrust litigation.

104.    Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel have interests adverse to those of the Class.

105.    There are numerous questions of law and fact common to Plaintiff and Class members that predominate over any question affecting only individual Class members, the answer to which will advance resolution of the litigation as to all Class members.  These common legal and factual issues include:

a.    the extent to which Defendants collectively possess market power in the Relevant Market for distribution of Dental Supplies;

b.    whether, through the conduct alleged in this Complaint, Defendants maintained or enhanced their collective market power;

c.    whether Defendants agreed with one another to cause others to unlawfully boycott competitors, with the aim of lessening competition for the distribution of Dental Supplies;

d.    whether Defendants agreed to illegally boycott or threaten to boycott dental associations that did or planned to do business with competitors;

e.    whether Defendants agreed to illegally boycott or threaten to boycott Dental Supplies manufacturers in order to deter manufacturers from doing business with rival competitors of Dental Supplies;

f.    whether Defendants did in fact illegally boycott one or more competitors;

g.    whether Defendants entered into exclusionary agreements that unreasonably restrained trade and impaired competition;

h.    whether Defendants did in fact illegally boycott and/or threaten to boycott manufacturers of Dental Supplies;

i.    whether Defendants pressured manufacturers to boycott one or more of Defendants' distributor competitors;

j.    whether Defendants agreed to illegally boycott and/or threaten to boycott state dental associations that did business or planned to do business with competitors;

k.    whether Defendants pressured dentists and laboratories to illegally boycott one or more of Defendants' distributor competitors;

l.    whether Defendants' conduct as alleged herein constitutes a per se illegal violation of the federal antitrust laws;

        m.      whether, and to what extent, Defendants' conduct caused direct purchasers (members of the Class ) to pay above-fair-market prices or fees, thus incurring antitrust injuries.

        n.      These and other common questions of law and fact predominate over any questions affecting only individual members of the Class.

These and other common questions of fact and law predominate over any questions affecting only individual Class members.

106.    Individual Class members prosecuting separate actions would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

107.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims simultaneously in a single forum, moving forward efficiently and without the duplication of expense and effort that numerous individual actions would entail. No difficulties are likely to be encountered in managing this class action that would preclude maintaining it as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class is readily ascertainable from Defendants' records.

108.    Defendants have acted on grounds generally applicable to the entire Class, making final injunctive relief or corresponding declaratory relief appropriate for the Class as a whole.

## CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1
### Unlawful Agreements in Unreasonable Restraint of Trade)

109.    Plaintiff incorporates by reference the preceding allegations.

110.    As set forth above, in violation of Section 1 of the Sherman Act, Defendants have combined and conspired to fix, inflate, raise and maintain prices for Dental Supplies sold to Plaintiff and members of the Class during the Class Period. Defendants effectuated their combination and conspiracy by, among other ways, entering into agreements with one another to boycott and threatening to boycott and boycotting state dental associations, Dental Supplies distributors, Dental Supplies manufacturers, and Dental Practitioners that were doing business or considering doing business with new low-cost distributors and other competitors. This conspiracy was a per se unlawful group boycott, or alternatively, was an unlawful restraint under the rule of reason.

111.    Each Defendant has committed at least one overt act, such as boycotting entities that did business with new low-cost distributors, to further the conspiracy alleged in this complaint.

112.    Defendants' anticompetitive conduct alleged in this Complaint had a direct, substantial, and foreseeable proximate effect on United States trade and commerce.

113.    Defendants' anticompetitive conduct alleged in this Complaint maintained and increased Defendants' collective market power in the Dental Supplies market, enabling Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class.

114.    Plaintiff purchased Dental Supplies from Defendants that were affected by the illegal anticompetitive conduct alleged in this Complaint. Plaintiff purchased Dental Supplies from

one or more Defendants and was affected by the illegal anticompetitive conduct alleged in this Complaint.

115.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiff and the Class consists of paying prices for Dental Supplies that were inflated above competitive levels. Such injury, in the form of overcharges, is of the type that antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

116.    There are no procompetitive justifications for Defendants' conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

A.    That the Court determine that the Sherman Act claims contained herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and that Plaintiff be found to be an adequate representative;

B.    That Defendants' unlawful agreements, conspiracies, or combinations alleged herein each be declared and decreed to be a per se violation of Section 1 of the Sherman Act;

C.    That Plaintiff and the Class recover damages as provided by law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws;

D.    That Defendants, their affiliates, subsidiaries, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be compelled to implement appropriate antitrust compliance training and progress, and be permanently enjoined and restrained from in any manner: (a) continuing, maintaining, or renewing the conspiratorial conduct alleged herein or proved at trial;

(b) entering into any conspiracy alleged herein or any other conspiracy or combination having a similar purpose or effect; (c) adopting or following any practice, plan, program, or device having a similar purpose or effect; (d) communicating or causing to be communicated to any other person engaged in distributing Dental Supplies , information concerning competitors or new or competing business models or delivery models, or prices or other terms or conditions of sale of Dental Supplies except to the extent necessary in connection with bona fide sale transactions between the parties to such communication; or (e) engaging in such other acts as the proof herein shall demonstrate to be appropriate for injunctive relief;

E.      That Plaintiff and Class members be awarded pre- and post-judgment interest and that the interest be awarded at the highest legal rate from and after the date of the service of the initial complaint in this action;

F.      That Plaintiff and Class members recover their costs of this suit, including reasonable attorneys' fees as provided by law;

G.      That Plaintiff and Class members receive such other, further, and different relief as the case may require and the Court may deem just and proper under all the circumstances.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: March 15, 2016

BRAGAR EAGEL & SQUIRE, P.C.


By: _s/ Jeffrey H. Squire_____
        Jeffery H. Squire
885 Third Avenue, Suite 3040
New York, NY 10022
(212) 308-5858
squire@bespc.com

*Attorneys for Plaintiff and the Class*